## AFFIDAVIT OF SPECIAL AGENT ANDREW R. FRIGON

I, Andrew R. Frigon, a Special Agent with the Drug Enforcement Agency, being duly sworn, depose and state as follows:

## INTRODUCTION

1. I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2. I am a Special Agent with the U.S. Drug Enforcement Administration ("DEA") and have been for the past four months. I am currently assigned to the Organized Crime Drug Enforcement Task Force ("OCDETF") Boston Strike Force, which is a strike force incorporating various law enforcement agencies, including the Federal Bureau of Investigation ("FBI"), the DEA, Homeland Security Investigations ("HSI"), and the U.S. Marshals Service ("USMS"), among other agencies. My primary duties at the DEA include the investigation of organized drug trafficking organizations ("DTO").

3. Prior to becoming a DEA Special Agent, I was employed by the New Hampshire Department of Safety, Division of State Police, as a State Trooper and was so employed from August 2012 to November 2016. I hold a Bachelor of Science Degree in Criminal Justice from Worcester State University.

4. While a State Trooper, I received specialized training in the interdiction of controlled substances. During my career as a State Trooper and DEA Special Agent, I have conducted a wide variety of drug investigations, which have included the apprehension of individuals engaged in the trafficking and distribution of large quantities of illicit substances. As a result of these drug investigations, I have conducted extensive post arrest interviews with these

individuals where I have gained knowledge regarding the evolving tends, techniques, behaviors and procedures utilized by drug traffickers, drug distributors, co-conspirators and individuals involved in the procurement and use of illicit narcotics.

5.      As a DEA Special Agent and previously as a State Trooper, I have participated in and conducted investigations that have resulted in the arrests of individuals who have smuggled, received, and distributed drugs, as well as in the seizure of illegal drugs and proceeds derived from the sale of those illegal drugs.  In addition, I have conducted, in connection with these and other cases, follow-up investigations and evidentiary reviews relating to the concealment of drug-related assets, money, and bank records and the identification of co-conspirators.  I have also received courses of instruction from the DEA relating to investigative techniques and the conducting of controlled substance and financial investigations.

6.      Based on my training and experience, I am familiar with the methods of operation employed by narcotics traffickers operating at the local, statewide, national and international levels, including those involving the distribution, storage, and transportation of narcotics and the collection and laundering of money that constitutes the proceeds of narcotics-trafficking activities. I am aware that drug traffickers commonly use cellular telephones in furtherance of their drug trafficking activities and frequently change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance.

7.      The information contained in this affidavit is based on my own involvement in this investigation, oral and written reports by other law enforcement officers, physical surveillance, information from confidential informants/cooperating witnesses, public records, database checks, and other investigations.  I make each of the following statements based upon my own personal knowledge, belief, and information and the knowledge, belief and information of other

investigators involved in this investigation. The dates and times in this affidavit are approximate.

## PURPOSE OF AFFIDAVIT

8. This affidavit is being submitted in support of a criminal complaint against Dalnovis R. DELAROSA ARIAS (hereinafter, "DELAROSA") and Minerva RUIZ (collectively herein, the "Defendants"), charging that beginning at least in or about July 2017 and continuing until the present, the defendants did knowingly and intentionally conspire to possess with intent to distribute and distribute heroin, a Schedule I controlled substance, in violation of 21 U.S.C. §846.

9. This affidavit is also being submitted in support of an application for search a warrant for 27 Milton Street, Lawrence, Massachusetts ( the "Target Location"), which is believed to be the residence of DELAROSA and RUIZ. A full description of the Target Location is attached hereto as Attachment A, and is incorporated herein by reference.

10. This affidavit does not set forth all the facts developed during the course of this investigation. Rather, it sets forth only those facts that are necessary and sufficient to establish probable cause to believe that the Defendant identified herein has committed the above-described controlled substance offenses and that evidence, fruits, and instrumentalities of these offenses will be found in the Target Location as described below.

## Probable Cause

11. Since at least June 2017, the DEA and HSI have been investigating the drug trafficking activities of DELAROSA[1] and RUIZ. In approximately June 2017, a confidential

---

[1] A criminal database search revealed that DELAROSA has a current outstanding state drug warrant from 2014.

source ("CS") informed HSI agents that an unidentified male using telephone number (978) 398-7911 was looking to sell multiple kilograms of heroin in the Massachusetts area. In June 2017, a Boston Strike Force HSI cooperating witness ("CW")[2] spoke to DELAROSA over (978) 398-7911. This conversation was recorded. During that conversation, DELAROSA told the CW that he wanted to arrange the sale of multiple kilograms of heroin.

12. On July 13, 2017, the CW and DELAROSA agreed to meet in person that day to negotiate the previously discussed heroin transaction. At approximately 2:00 p.m., investigators saw DELAROSA and RUIZ standing outside the Target Location at the rear of a white Honda Civic bearing Massachusetts Registration 363VJ7 (hereinafter, the "Honda Civic"). The vehicle is registered to RUIZ at the Target Location. Investigators saw DELAROSA and RUIZ leave the Target Location in the Honda Civic with RUIZ driving the car. Investigators followed DELAROSA and RUIZ to the location in Charlestown, Massachusetts, where the CW was waiting. At approximately 4:20 p.m., DELAROSA and RUIZ arrived at the prearranged location, and the CW got into the Honda Civic. This meeting was recorded and surveilled by investigators.

13. During the face-to-face meeting inside RUIZ's Honda Civic, DELAROSA again offered to sell the CW kilogram quantities of heroin. The CW told DELAROSA to call him when he (DELAROSA) had the heroin. RUIZ was present inside the car while the heroin transaction was negotiated.

---

[2] The CW has been a documented, paid CW for HSI for approximately one year. The CW has provided information in other cases that has led to seizures of drugs. Based on the information provided by CW in this and prior investigations, agents believe the CW to be reliable and trustworthy. The CW is also receiving immigration benefits from HSI in return for his/her cooperation.

4

14. After the July 13, 2017 meeting, the CW and DELAROSA spoke a number of times by phone, and all of the calls were recorded. During these calls, DELAROSA told the CW he was waiting to obtain the heroin.

15. On or about August 22, 2017, DELAROSA called the CW and told him he (DELAROSA) had just returned from New York and was ready to meet with the CW to sell the CW two kilograms of heroin. DELAROSA quoted a price of $60,000 per kilogram. The call was recorded.

16. On August 23, 2017, the CW and DELAROSA again spoke by phone, at which time they arranged to meet the following day at an agreed-upon location to conduct the two-kilogram heroin transaction. This call was also recorded.

17. On August 23, 2017, investigators conducting surveillance in the area of the Target Location saw DELAROSA and RUIZ standing in the driveway of the Target Location next to RUIZ's Honda Civic.

18. On August 24, 2017, at approximately 3:00 p.m., RUIZ drove DELAROSA in the Honda Civic to the prearranged location to meet with the CW. The CW got into the Honda Civic. DELAROSA gave the CW two cereal boxes, each of which contained a brick shaped object wrapped in black tape. The CW got out of the Honda Civic, which signaled to investigators that the drugs were inside the car. Investigators stopped the car and removed RUIZ and DELAROSA. Investigators recovered the two cereal boxes, each of which contained one brick shaped object wrapped in black tape. I know from my training and experience that kilograms of heroin are commonly pressed into brick shapes and wrapped in tape. A field test was performed on the contents of one of the bricks, which tested positive for the presence of opiates.

**Target Location**

*A.     Drug Traffickers' Use of Residences Generally*

19.     Based upon my training, experience, participation in other narcotics investigations, and extensive discussions with other law enforcement officers experienced in narcotics investigations, I am aware that it is generally a common practice for drug traffickers to store drug-related paraphernalia and records in their residences for longer periods of time than they keep drugs in their residences. I have participated in the execution of search warrants of the residences of drug traffickers whose criminal activity is similar to that of the Defendants'. I know that in a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, drug related evidence has typically been recovered including cash, records, drugs, and other valuable items. Based on this experience and my training, I believe that:

a)     Drug traffickers often find it necessary to store large sums of cash received from the sale and distribution of controlled substances outside the normal banking system. Accordingly, narcotics traffickers frequently maintain large amounts of cash and other valuable assets at their residence in order to maintain and finance their ongoing business;

b)     Drug traffickers frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders, emails, and other documents relating to the transportation, ordering, sale and distribution of controlled substances and monetary instruments and other assets, and to debts and collections relating to monies owed or due for the distribution of controlled substances; and documents relating to the transportation of controlled substances, such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts. Such documents may be maintained in paper or electronic form, and are generally maintained where the narcotics traffickers have ready access to them,

including in cell phones and other electronic media capable of storing such information electronically, at locations such as their residences or other locations where they regularly conduct their drug business. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises;

c) It is common for drug dealers to secrete records of drug transactions in secure locations within their cell phones, computers, residences, businesses, and/or other locations and devices over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities;

d) It is common for significant drug traffickers to hide controlled substances, proceeds of drug sales (i.e., large amounts of currency, financial instruments, jewelry, safety deposit keys and deeds to real property), and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, documents

indicating travel in interstate and foreign commerce, and evidence of financial transactions relating to obtaining, transferring, hiding or spending large sums of money made from controlled substance trafficking activities in secure locations within residences, businesses, or other locations over which they maintain dominion and control, for ready access and to conceal them from law enforcement authorities;

e) Drug traffickers commonly maintain electronic and paper books or documents which reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization, and other contact or identification data relating to the distribution of controlled substances. Such records and items are maintained where the traffickers have ready access to them, commonly on the traffickers' cell phone(s). They also tend to maintain for long periods of time telephone billing records that evidence the placing of large numbers of calls each month in connection with narcotics dealing;

f) Drug traffickers commonly have photographs of themselves, their associates, their property and their products in their possession or in their residences, and frequently maintain these photographs on their cell phone(s) and other electronic devices;

g) Drug traffickers frequently maintain the items described above inside safes, key-lock strong boxes, suitcases, safe-deposit boxes and other containers, which are further secured by combination and/or key locks of various kinds in order to hide the contraband from other individuals living at or in the vicinity of their residence;

h) Drug traffickers frequently build "stash" places within their residences or other locations in order to store illicit drugs as well as the items described above;

i) Residents, whether drug traffickers or not, typically keep items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the

subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

20.     In my training and experience, I know that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Based on my training and experience, drug traffickers often use multiple phones and change their phone numbers frequently to avoid law enforcement detection. A cellular telephone is a handheld wireless device used for voice and text communication as well as for accessing the internet. Telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls and text messages made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of

the device. Based on my training, experience, and research, I know that many cellular telephones have capabilities described above. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device as well as his criminal accomplices. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to further prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

21.     Based upon all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth hereinafter, I believe the Defendants, like many drug traffickers, use their residence in furtherance of their ongoing drug-trafficking activities, and that, among other things, documentary and other evidence regarding those activities, including, but not limited to, the items set forth in Attachment B, will be found in the Target Location. *See e.g.*, *United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999).[3]

**B.**   ***Description of Target Location***

**(1)  27 Milton Street, Lawrence, Massachusetts – Target Location**

Description of Target Location

22.     **27 Milton Street, Lawrence, Massachusetts** is the right-side apartment located in a tan with white trim duplex residential building that has two front entrances. The entry to 27

---

[3] In *Feliz*, the First Circuit made clear that, in the drug trafficking context, evidence of drug transactions can be expected to be found in a drug trafficker's residence for months after evidence of the last transaction. 182 F.3d at 87 ("[C]ourts have upheld determinations of probable cause in trafficking cases involving [three months long] or even longer periods") (citing *United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991)(two year-old information relating to marijuana operation not stale)). As the First Circuit has explained "[b]y its very nature, drug trafficking, if unchecked, is apt to persist over relatively long periods of time." *United States v. Nocella*, 849 F.2d 33, 40 (1st Cir. 1988).

Milton Street, the target door, is the right front entrance. The entrance door is a white door with two small windows. The number "27" is clearly displayed on the entrance door. The address for the target location is listed on the registration for the Honda Civic registered to RUIZ. Based on the observations to date that are detailed herein, I believe that controlled substances, including heroin, money, drug ledgers, and phones used to conduct drug business, and the other items described in Attachment B will be found inside the Target Location.

## CONCLUSION

23.     Based on the information set forth above, I believe probable cause exists to believe that DELAROSA and RUIZ have engaged in violations of 21 U.S.C. §846, namely, conspiracy to possess with intent to distribute, and the distribution of heroin, and that evidence of said criminal offense, as set forth in Attachment B, will be found inside the Target Location.

I, Andrew R. Frigon, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

_____
Andrew R. Frigon
DEA SPECIAL AGENT

Subscribed and sworn to me this the 24th day of August 2017.

_____
HONORABLE PAGE KELLEY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS